23855. COLONIAL STORES, INC. v. UNDERCOFLER, Commissioner.

ARGUED JANUARY 10, 1967—FEBRUARY 9, 1967—REHEARING DENIED FEBRUARY 23, 1967.

*Kilpatrick, Cody, Rogers, McClatchey & Regenstein, George B. Haley, Jr., G. Kimbrough Taylor, Jr.,* for appellant.

*Arthur K. Bolton, Attorney General, Louis F. McDonald, William L. Harper, Assistant Attorneys General,* for appellee.

GRICE, Justice. The issue here is whether purchases for the purpose of resale, within the meaning of the Retailers' and Consumers' Sales and Use Tax Act (Ga. L. 1951, p. 360, as amended), occurred when the taxpayer purchased premium merchandise to be used to redeem trading stamps issued to its customers in connection with sales of items in its supermarkets.

This issue arose when the taxpayer, Colonial Stores, Inc., filed a petition in the Superior Court of Fulton County against the State Revenue Commissioner for the refund of sales and use taxes which the taxpayer claims were illegally and erroneously collected from it on such purchases. The trial court held in favor of the taxpayer. However, the Court of Appeals reversed (*Undercofler v. Colonial Stores, Inc.,* 114 Ga. App. 466 (151 SE2d 794)), holding that the taxpayer's purchase of the premium merchandise was not for the purpose of resale. We granted certiorari.

The facts necessary for decision here, taken from the stipulation of the parties in the trial court, are those which follow.

During the period in question, Colonial Stores, Inc., was a dealer under the Sales and Use Tax Act, supra, and was required to collect the tax imposed by the Act from its customers and pay it to the State.

In consideration of purchases made by Colonial's customers, it issued to them redemptive coupons called "Sav-a-Stamps" which were redeemable in exchange for merchandise at its retail stores. Those stamps were issued at the approximate rate of 10 stamp units for each dollar of sales. Bonus stamps were frequently issued in consideration of the purchase of particular items of merchandise that Colonial desired to promote. Also, occasionally it offered "free" stamps to customers or potential customers who would come to its stores, without any purchase being required. It issued stamps on sales not taxable under the Sales Tax Act as well as on those which were taxable.

The redemptive value of the stamps was equal to the cost of the premium merchandise purchased by Colonial and used in redeeming the stamps, and appeared on its profit and loss statement as an item of expense entitled "Trading Stamp Expense."

The cost of the premium merchandise to Colonial was a cost of its doing business, and like all other such costs was reflected in the retail prices charged its customers for food and other items.

Colonial collected from its customers and paid to the State sales taxes equal to three percent of its gross receipts from sales made in Georgia and did not deduct from such gross receipts, in computing such taxes, the cost to Colonial of the premium merchandise purchased and used to redeem stamps.

In addition to the aforesaid taxes collected from customers and remitted to the State, Colonial computed and paid to the State as sales taxes an amount equal to three percent of the cost of the premium merchandise distributed to its customers in redemption of stamps in Georgia.

Colonial received no consideration for the premium merchandise other than the stamps which were redeemed with such merchandise.

At the time of the sale of food and other items in Colonial stores and at the time of issuance of stamps in connection therewith, no separate charge and no separate cash register receipt were made for the stamps issued in connection with the sale.

If a customer refused, or did not receive, stamps no reduction was made by Colonial in the total price of the goods sold to such customer.

These facts, as we appraise them, require the conclusion that what transpired between Colonial and its customers with reference to the stamps and premium merchandise was a sale in contemplation of the Sales and Use Tax Act, the stamps issued to such customers in consideration of their purchases representing the right to merchandise. Section 3 (b) of the Act (*Code Ann.* § 92-3403 a (B)) defines a "sale" as "any transfer of title or possession, or both  . . .  in any manner or by any means whatsoever of tangible personal property for a *consideration  . . .*" (Emphasis supplied.)

Here, there was consideration, as contemplated by the Act, so as to constitute a sale.

It is evident from what the parties themselves stipulated that consideration was present: "During said period, in consideration of purchases made by [Colonial's] customers, and at the time such purchases were made, [Colonial] issued to such customers redemptive coupons called 'Sav-a-Stamps,' which were redeemable in exchange for premium merchandise at [Colonial's] retail stores . . . Said stamps were issued by [Colonial] to its customers at the approximate rate of 10 stamp units for each dollar of sales." Also, "The redemptive value of such Sav-a-Stamps was equal to the cost of the premium merchandise purchased by [Colonial] and used in redeeming such stamps. . . The cost of said premium merchandise to [Colonial] . . . was reflected in the retail prices . . . charged its customers for food and other items purchased at its supermarkets."

Thus, although the objective of the trading stamp scheme may have been sales promotion and the enticement of customers, the premium merchandise was not given away. It was paid for by the customers since the cost was included in the retail sales prices charged them. And, according to the stipulation, "[Colonial] collected from its customers and paid to the State sales taxes equal to 3 percent of [its] gross receipts from sales made in Georgia . . . and did not deduct from such gross receipts, in computing such taxes, the cost to [it] of the premium merchandise purchased and distributed by it in redemption of Sav-a-Stamps." Therefore, the customers not only paid for the premium merchandise, but also paid the sales taxes on it.

Consideration was not lacking because, as contended, at the time of the sale of food or other items and issuance of the stamps in connection therewith no separate charge was made for the stamps.

Nor was consideration absent because, as also contended, when a customer refused or for any reason did not receive the stamps with the purchase no reduction was made by Colonial in the total price of goods sold to such customer.

These contentions are not meritorious in view of the decision

of this court in *Undercofler v. Eastern Air Lines, Inc.*, 221 Ga. 824, 833-834 (147 SE2d 436) (two Justices disqualified).

The ruling as to the tax consequences of the purchase of the meals in that case is controlling upon the case at bar. The air line contended that its purchase of the meals from the supplier was not taxable because it was for resale and also that its sale of the meals to passengers was exempt because such sale took place outside of this state. The air line's petition alleged that the meals were purchased by it in Georgia ready to eat and put into the galleys of its aircraft just prior to departure and were not served until the Georgia line was passed, that no separate charge was made for them, but that the price of them was included in the cost of the tickets.

This court agreed that the air line's purchase of the meals from the supplier was *not* taxable since it was for resale, but ruled that the air line's sale of such meals to its passengers *was* taxable.

The Court said: "As we view what is alleged, such sale occurs when the ticket, the cost of which includes the price of the meal, is purchased. . . The fact that actual delivery of the meal does not occur until later does not prevent perfection of its sale at the time of purchase of the ticket. The passenger impliedly consents to delivery to be made during the flight. Under these circumstances, the sale is complete when the ticket is bought. [Citations.] The fact that the price of the meal is included in the cost of the ticket does not prohibit a tax on the meal. We must conclude from the allegations that 'the price of the meal' is a known amount and hence separable from the charge made for transportation."

The factual situation there is analogous in principle to that here. There, the price of the meal to be served in flight was not separately stated to the passenger, and the price of the ticket was the same whether or not the passenger consumed the meal. Here, the price of the stamps was not separately stated to the customer, and the price of the items purchased from Colonial's stores was the same whether or not the customer received the stamps.

The trading stamp transactions here between Colonial and

its customers thus constituted a sale within the meaning of the Sales and Use Tax Act. Hence, the purchase of the premium merchandise by Colonial was a purchase for the purpose of resale, which is not taxable under that Act.

For the reasons stated above the judgment of the Court of Appeals is

*Reversed. All the Justices concur, except Duckworth, C. J., who dissents, and Cook and Undercofler, JJ., who are disqualified.*

DUCKWORTH, Chief Justice, dissenting. The controlling question here is whether or not the delivery of stamps to a purchaser of goods is a "sale" or a "gift." This is true because it determines whether the exchange of the premium merchandise for stamps is a sale or gift. If the delivery of the stamps was a sale of the stamps then the premium merchandise is thereby purchased because the stamps are symbolic of the premium goods. On the other hand if the delivery of the stamps to the purchaser of merchandise at the identical price with or without stamps is a gift of the stamps then the premium merchandise which the stamps symbolize is thereby given, hence not resold, and consequently the sales tax is collectible on the original purchase of the premium goods.

The majority of necessity have ruled that the delivery of the stamps in the first place is a sale. Yet they have not and cannot identify the price thereof. They have wandered blindly into the area of operating private enterprise without having the remotest experience or knowledge of what is necessary to make it succeed, or what the operator legitimately considers necessary and freely chooses to employ for that purpose. Of course sound business requires that sale prices cover all costs, including advertisement and building good will, but it indisputably includes a profit, which belongs exclusively to the operator. Then being free to expend this profit which is his, he can spend it for advertisements, premiums, stamps, or anything else that he freely chooses to advance, enlarge and improve his business. Despite the fact that his customers contributed such funds as a part of the price they paid, such funds thereupon ceased to belong to the customer and became the property of the dealer.

He has an untrammelled right to expend such funds of his for stamps to be given to customers free, and for which the customer can obtain premium merchandise. This last transaction is indisputably not a sale subject to sales tax.

The motion for a rehearing posed a hypothetical question that cannot be answered consistently with the majority opinion. And the majority do not even attempt to do so. It is—if with a sale of fertilizer that is exempt from the sales tax, 100 stamps are delivered, as in this case, then how can the sales tax for the stamps that are not exempt be collected? What was paid for them? If their delivery is a sale as the majority holds, then the tax officials have a duty to collect the sales tax. The answer of the majority is that it is an administrative problem. But if this court cannot answer, then what can the administrator do? If a declaratory judgment proceeding is brought praying for a declaration of how such sales tax can be ascertained, this court would thereby be confronted with the duty to answer a question for which there is no answer because the premise "sale" is completely absent. It is absent because there was no sale, and if properly faced now, that inescapable fact would be admitted and an affirmance declared.

For these reasons I dissent, and I feel that the public interest has not been served by this decision which thus confuses the tax law. I can only extend my sympathy to the tax officials who are charged with a public duty to collect sales tax who are by this decision forced to face an insoluble dilemma. They would be justified in tossing it back in a proper case to this court which created it and thereby force an answer, if that is possible, or an admission that there is no answer.